[Crim. No. 10154. In Bank. Feb. 17, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CURTIS FRANKLIN TALLEY et al., Defendants and Appellants.

832

Erling J. Hovden, Public Defender, Edward B. Olsen and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Harvey D. Unrot and Jack K. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

BURKE, J.—Curtis Franklin Talley and Elwood Talley, Jr., were charged with two counts of burglary (Pen. Code, § 459). The public defender was appointed to represent them. A jury trial was waived, and the matter was submitted on the

preliminary hearing transcript with the right reserved to offer additional evidence. The court found each defendant guilty on each count. A motion for a new trial was denied, and defendants appeal from the judgments of conviction.

They contend that evidence obtained in an unlawful search and statements inadmissible under *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], were improperly admitted at their trial. We have concluded that the search was lawful, that it was error to admit the statements, and that the error was prejudicial as to Curtis on both counts but was harmless as to Elwood.

On March 24, 1964, Otto Giljohann locked the doors to his clothing store in Long Beach. The next day he found a door to the store open and merchandise missing.

On March 30, 1964, Los Angeles Police Officer Garrahan was told by an informant that defendants had been involved in many burglaries in the Long Beach area and ''were taking TVs, men's watches and clothing''; that Elwood lived at 8507 Hooper Avenue, and that defendants often took the loot to this address and left it overnight before getting rid of it the next morning. Another informant told Garrahan that defendants were committing burglaries in places outside of Long Beach. Garrahan related the information he received to Long Beach Police Officer Morrill.

On April 4, 1964, Olympia Meyer locked the doors to her dress shop in Long Beach. When she returned on April 6, 1964, she found the lock to a door broken and merchandise gone. About 4 a.m. on April 6, 1964, Robert Tondee, who lived next door to the dress shop, heard noises from the direction of the dress shop and on looking outside saw two men in a Plymouth, who then drove away. About a half hour later Tondee again heard the same noises. He looked out and saw the same Plymouth, and the cover of its trunk compartment was up. When a police car drove by, Tondee observed the two men in the Plymouth fall down in the seat. As the Plymouth drove off he took down the license number. Police officers came to Tondee's residence about 4:30 or 5 that morning, and he gave them the license number.

The license number belonged to a Plymouth registered to Gilbert Pippins, who lived in Los Angeles. Los Angeles Police Officer Wetzel received a call that the Plymouth and two male Negroes had been seen by someone in Long Beach and were wanted by the police department in Long Beach in connection with a burglary in that city, and about 5 a.m. on April 6,

1964, Wetzel and another officer went to Pippins' home. They did not see the Plymouth there and departed for a few minutes. Upon returning they saw the Plymouth parked in front of Pippins' home. They called another police unit to meet them, and about 6 a.m., while awaiting its arrival, they saw Curtis, Pippins, and a girl leave the house and get into the Plymouth. The officers approached them and asked where the car had been. Pippins stated at first in Curtis' presence that as far as Pippins knew the car had been in front of his home all night but upon being questioned further outside of Curtis' presence Pippins stated that he had loaned the car to Curtis and that Curtis had just returned it. Curtis and Pippins were arrested at this time. A search of the Plymouth revealed no stolen property.

On April 8, 1964, Long Beach Police Officers Morrill, Harmon, and Bauer, who did not have an arrest or search warrant, went to Elwood's house at 8507½ South Hooper Avenue in Los Angeles to arrest him. A few minutes before leaving their station, Morrill had been informed by Los Angeles Police Officer Garrahan that "clothing from our burglary and a large pry tool that we were seeking were in that residence." (The record does not show the source of Garrahan's information.)

On arriving at Elwood's home Morrill went to the front door and knocked. Harmon, who went to the rear of the house to prevent anyone escaping, observed a male Negro "come running through the room." Harmon had a "mug shot" of Elwood, and the man he saw running appeared to be Elwood. Harmon asked his name, and, when the man replied "Elwood," Harmon told him he was under arrest for burglary and drew his gun. Elwood refused to admit Harmon and left the room. In the meantime Morrill talked with Yvonne Talley, who had answered his knock. She stated that Elwood was not at home. Near the end of the conversation Elwood rushed up to the front door from inside the house. He wanted to know what was going on and said there was a man at the back of the house who pointed a gun at him and threatened to shoot him. Upon inquiry he said he was Elwood, and Morrill then told him he was under arrest. Morrill asked him to open the door, and Elwood refused to do so, saying that the man at the rear of the house was going to kill him. Morrill said that he would protect Elwood. Elwood went back into the interior of the house, and Harmon, after kicking in the rear door, let Morrill in.

The officers searched Elwood's house and found merchandise that had been taken in both of the burglaries charged and a crowbar which, according to an expert, was the instrument that made an impression on the door of Giljohann's store.

Curtis took the stand in his own defense. He denied committing the burglary at the dress shop and stated he did not remember having confessed to it. He testified that he borrowed Pippins' car about 2 a.m. on April 6, 1964. When asked if he afterwards had the car in his possession until a few minutes before his arrest, he replied, ''No. We had breakfast.'' He admitted having previously been convicted twice of burglary and once of assault with intent to commit robbery.

At the trial an objection was made to the evidence found at Elwood's home on the ground that it was obtained in an illegal search since the officers had no warrant and assertedly lacked probable cause to arrest Elwood. The People claim that there was probable cause for Elwood's arrest and the search was incidental thereto.

A peace officer may arrest a person without a warrant ''[w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, . . .'' (Pen. Code, § 836.) ▮ Reasonable or probable cause exists when the facts and circumstances within the knowledge of the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense. (*Beck* v. *Ohio*, 379 U.S. 89, 96 [13 L.Ed.2d 142, 85 S.Ct. 223] ; *People* v. *Schader*, 62 Cal.2d 716, 722 [44 Cal. Rptr. 193, 401 P.2d 665].) ▮ The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made. (*People* v. *Privett*, 55 Cal.2d 698, 701 [12 Cal.Rptr. 874, 361 P.2d 602] ; *People* v. *Paul*, 147 Cal.App.2d 609, 618 [305 P.2d 996].)

▮ Information obtained from others may be relied upon to show probable cause. (*Ker* v. *California*, 374 U.S. 23, 35-36 [10 L.Ed.2d 726, 83 S.Ct. 1623] ; *Draper* v. *United States*, 358 U.S. 307, 311-312 [3 L.Ed.2d 327, 79 S.Ct. 329] ; *People* v. *Smith*, 50 Cal.2d 149, 151 [323 P.2d 435] ; *People* v. *Boyles*, 45 Cal.2d 652, 655-656 [290 P.2d 535].) Although information provided by a known informer of unproved reliability or by an anonymous informer is relevant on the issue of probable cause, an arrest ordinarily may not be based solely on such information, and evidence must be presented to the court that would justify the conclusion that reliance on the information

was reasonable. (*People* v. *Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174] ; *People* v. *Reeves,* 61 Cal.2d 268, 273-274 [38 Cal.Rptr. 1, 391 P.2d 393] ; *Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36].) In the present case, so far as appears, when the informer gave the police the information relating to defendants' involvement in burglaries in Long Beach he was of unproved reliability[1] and it is therefore necessary to consider whether the other matters known to the officers at the time of Elwood's arrest were sufficient to justify their reliance on that information.

The second informer was also not shown to be of known reliability, and the information supplied by him that defendants were committing burglaries outside of Long Beach clearly was not alone sufficient corroboration of the first informer's report. However, before Elwood's arrest Curtis was arrested, and the knowledge acquired by the police of the facts and circumstances surrounding Curtis' arrest as set forth above furnished substantial corroboration.[2] If the informer had told the truth about Curtis, it was not unreasonable to believe that he had probably also told the truth about Elwood. In addition, as we have seen, when the officers went to Elwood's home before arresting him (see Pen. Code, §§ 834, 835) Harmon observed him "come running through [a] room" at the rear of the house apparently after Morrill knocked on the front door, and Yvonne falsely told Morrill that Elwood was not at home. Furtive or suspicious conduct may, of course, serve to substantiate information from an informant. (*Willson* v. *Superior Court, supra,* 46

---

[1]It is undisputed that defendants may not complain on appeal of the prosecutor's refusal to disclose the informer's identity since at the trial they did not move to strike the officers' testimony or indicate that the refusal to identify the informer was relied upon to establish the illegality of Elwood's arrest and the search at his home. (*Coy* v. *Superior Court,* 51 Cal.2d 471, 473 [334 P.2d 569]; *Priestly* v. *Superior Court,* 50 Cal.2d 812, 819-820 [330 P.2d 39]; *People* v. *Postell,* 170 Cal.App.2d 31, 34-35 [338 P.2d 454].)

[2]Defendants assert that there was no proof that the Long Beach police officers who arrested Elwood had knowledge of Curtis' arrest in Los Angeles. Even if it be assumed that knowledge by the particular arresting officers was required, such knowledge may be inferred from the evidence that they were working together with the Los Angeles Police Department on defendants' case and that the arrest of Curtis by Los Angeles officers was for a burglary committed in Long Beach.

Defendants also assert that Curtis' arrest was unlawful and that therefore the discovery by the officers that there was no loot in the Plymouth, a fact consistent with the information from the first informer, could not be used as corroboration. (*People* v. *Reeves, supra,* 61 Cal.2d 268, 274-275.) However, the evidence previously recited clearly shows probable cause for Curtis' arrest.

Cal.2d 291, 295; *People* v. *Melchor,* 237 Cal.App.2d 685, 693 [47 Cal.Rptr. 235]; *People* v. *Currier,* 232 Cal.App.2d 103, 107 [42 Cal.Rptr. 562]; *People* v. *Landry,* 230 Cal.App.2d 775, 780 [41 Cal.Rptr. 202].) ▮ In our opinion the information from the first informer was sufficiently corroborated so that reliance thereon was reasonable, and the trial court's determination that the search was proper as an incident to a lawful arrest is amply supported by the record.

*Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], cited by defendants, differs from the present case. In *Aguilar,* which concerned the sufficiency of an affidavit supporting a search warrant to show probable cause, the court stated, ''Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant (*Jones* v. *United States,* 362 U.S. 257 [4 L.Ed.2d 697, 80 S.Ct. 725, 78 A.L.R.2d 233]) the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see *Rugendorf* v. *United States,* 376 U.S. 528 [11 L.Ed.2d 887, 84 S.Ct. 825], was 'credible' or his information 'reliable.' '' Defendants assert that in the present case the information from the informers did not show the underlying circumstances on which the conclusions were based. However, here, unlike *Aguilar,* there was substantial corroboration of the information from the informers. Moreover, where, as here, the initial determination of probable cause is made in an adversary proceeding it may be that it is incumbent on the defense to demand further particulars with respect to the informer's information (see 53 Cal.L.Rev. 840, 845-846), and here this was not done.

▮ Defendants further contend that Elwood's arrest and the search of his home in Los Angeles cannot be upheld because the officers, who were employed by the City of Long Beach, could not act as ''peace officers'' (Pen. Code, §§ 817, 836) outside city limits. (See *People* v. *Sandoval, ante,* pp. 303, 311-313 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Martin,* 225 Cal.App.2d 91, 93 et seq. [36 Cal.Rptr. 924].)[3]

[3]What was stated in *People* v. *Sandoval, supra, ante,* pp. 303, 313, fn. 10, with respect to an amendment to Penal Code section 817 is applicable here: ''If the 1965 amendment to Penal Code section 817 (Stats. 1965, ch. 2021, § 1, pp. 4585-4587) had been in effect when the defendant was arrested, that section would have authorized defendant's arrest even

However, at the trial defendants did not object on this ground to the arrest and search, and we will therefore not consider it on their appeal. (*People* v. *Carter,* 192 Cal.App.2d 648, 661 [13 Cal.Rptr. 541].)

Evidence of extrajudicial statements by defendants were admitted over an objection on the ground of *Escobedo* v. *Illinois, supra,* 378 U.S. 478.[4] On April 9, 1964, the day after his arrest, Elwood was questioned in a room at the Public Safety Building by Officer Bauer. Elwood denied having committed the burglaries. When asked why the stolen articles were at his house, Elwood first stated that he received them from one Roscoe but then changed his story and said that he received them from his brother. Bauer asked Elwood if he was not suspicious when his brother brought the clothing to his house, and Elwood replied that he was but wanted the clothing and thought he might not get it if he questioned his brother too much. He stated that his brother had been living with him and not paying rent, and he felt his brother was obligated to him. The officer asked, ''Didn't you feel suspicious in that a burglary of this type would have been committed . . .?'' and Elwood replied he felt ''that his brother was handier than he was.'' The officer said, ''Do you mean that you thought that your brother was a better burglar?'', and Elwood answered ''Yes.''

Curtis was then brought into the interview room, and Bauer talked with both defendants. Bauer asked Curtis ''if he could relate . . . what happened,'' and Curtis thereupon made a confession to the burglary at the dress shop. Bauer testified that when he asked Curtis about the burglary at Giljohann's store ''possibly through a misunderstanding, . . . Curtis . . . stated that he was going to plead guilty to those crimes with which he was charged. He then told me that he was not aware that he was charged with the Giljohann burglary . . . and he

if the officers had not been in fresh pursuit, since the amendment provides that ʻThe authority of a peace officer extends to any place in the state . . . as to a public offense . . . which there is probable cause to believe has been committed within the political subdivision that employs him. . . .ʼ Since the 1965 amendment does not apply retroactively, however (Pen. Code, § 3), it cannot validate defendant's 1964 arrest.''

[4]The trial in the instant case was after the decision was rendered in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, but before the decision in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602 [10 A.L.R.3d 974]. The principles enunciated in *Escobedo* and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], but not those in *Miranda* are therefore applicable here. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins, ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

had not committed [it]. When asked why some of the stolen articles were in his house, he stated that he had purchased them from . . . Roscoe.''

Bauer testified that neither he nor any other officer so far as he knew advised Curtis of his rights to remain silent and to have an attorney. The record does not show whether Elwood was advised of those rights, and in the face of a silent record we cannot presume that he was so advised. (*People* v. *Brooks,* 64 Cal.2d 130, 136 [48 Cal.Rptr. 879, 410 P.2d 383]; *People* v. *Stewart,* 62 Cal.2d 571, 580-581 [43 Cal.Rptr. 201, 400 P.2d 97], affd. 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) The record also does not show that either defendant waived his rights to counsel and to remain silent.

The statements were therefore inadmissible if the accusatory stage had been reached. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478; *People* v. *Dorado, supra,* 62 Cal.2d 338, 345 et seq.) ''Whenever . . . the officers have arrested the suspect and . . . have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached. . . .'' (*People* v. *Stewart, supra,* 62 Cal.2d 571, 577; see also *People* v. *Sears,* 62 Cal.2d 737, 741-742 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Forbs,* 62 Cal.2d 847, 850 [44 Cal.Rptr. 753, 402 P.2d 825].) *Stewart* pointed out that ''in most cases the process of interrogations following an arrest will so lend itself,'' and that in determining whether the police are carrying out a process of interrogations that lends itself to eliciting incriminating statements it is necessary to ''analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' (62 Cal.2d at pp. 578, 579.) The burden is on the prosecution to show that the statements were the result of something other than a process of interrogations that lends itself to eliciting incriminating statements. (*People* v. *Stockman,* 63 Cal.2d 494, 499 [47 Cal.Rptr. 365, 407 P.2d 277].)

Here the statements were made during interrogation at the Public Safety Building following defendants' arrests. Each defendant had been in custody at least one day at the time of the interrogation. The interrogation was tape-recorded. At the time of his arrest Curtis denied committing the burglary at the dress shop, i.e., the one to which he confessed during the interrogation. It appears that Curtis made the confession

after he was asked if he could relate what happened, but it does not appear whether or not additional questions were asked him during the course of his confession. The length of the interrogation and the hour when it began do not appear. In our opinion the prosecution failed to sustain its burden of showing that the statements were not made during a process of interrogations that lends itself to eliciting incriminating statements.

It was error to admit the evidence of defendants' statements to Officer Bauer, and the question remains whether the error was prejudicial. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 86 S.Ct. 824]; see also *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L. Ed.2d 171, 84 S.Ct. 229].)[5]

 We believe beyond a reasonable doubt that the admission of Elwood's statements was harmless as to him. His statements did not constitute a confession to either of the burglaries charged but to the contrary were primarily exculpatory in form. Although his inconsistent statements regarding the stolen articles found in his home might be viewed as showing a consciousness of guilt (cf. *People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]) and other of his statements might be viewed as having a slight tendency to incriminate him, the statements added little to the prosecution's strong case against him. Not only did the police find in his home loot from both of the burglaries and a crowbar which, according to an expert, was the instrument used to gain entrance to Giljohann's store but also his conduct at his home when the police came to arrest him tended to incriminate him, and his brother Curtis was apprehended about 6 a.m. in a car that had been seen containing two men less than two hours before in the vicinity of the dress shop under circumstances indicating the two men were committing the burglary.

[5]Although conceivably the error in admitting defendants' statements could be viewed as not constituting a ''federal constitutional error'' because the trial began before *Miranda* v. *Arizona, supra,* 384 U.S. 436, and the record does not show that either defendant requested and was denied the opportunity to consult with an attorney before making his statements (see *Johnson* v. *New Jersey, supra,* 384 U.S. 719, 733-734), we are satisfied that the harmless error test in *Chapman* v. *California, supra,* 386 U.S. 18 [17 L.Ed.2d 705, 86 S.Ct. 824] should be applied here. (Cf. *People* v. *Spencer,* 66 Cal.2d —— [57 Cal.Rptr. 163, 424 P.2d 715] (filed March 14, 1967).)

Elwood's extrajudicial statements were incriminating as to Curtis, but the trial court stated that the evidence of Elwood's statements was admitted solely with respect to Elwood. *People* v. *Aranda,* 63 Cal.2d 518, 524 et seq. [47 Cal.Rptr. 353, 407 P.2d 265], in which the trial was by a jury, held that the erroneous admission of an extrajudicial statement implicating both defendants may be prejudicial to the nondeclarant even though the jury was instructed to consider the statement only against the declarant. In the present case, the trial was by a judge rather than a jury. The judge was presumably better able than a jury to exclude from his consideration in determining Curtis' guilt the evidence admitted solely as to Elwood. (Cf. *In re Hernandez,* 64 Cal.2d 850, 851 [51 Cal.Rptr. 915, 415 P.2d 803].) We need not decide, however, whether this factor rendered the introduction of Elwood's extrajudicial statements harmless as to Curtis under the circumstances of this case, since Curtis' conviction must be reversed in any event.

 Curtis' statements concerning the burglary at the dress shop constituted a confession and were prejudicial per se as to him on the count charging that offense. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356.) He denied having committed the burglary at Giljohann's store, but his statements, included an admission regarding that offense in that, according to Officer Bauer, ''[W]hen [Curtis was] asked why some of the stolen articles [from Giljohann's store] were in his house, he stated that he had purchased them from . . . Roscoe.'' He thereby impliedly admitted that some of the loot was in his house, and since no one named Roscoe was called to testify, the trier of fact could reasonably have concluded that both Roscoe and the asserted purchase were fictitious (*People* v. *Citrino,* 46 Cal.2d 284, 289 [294 P.2d 32]). Also his extrajudicial confession to the burglary at the dress shop had some tendency to incriminate him with respect to the burglary at Giljohann's store since loot from both was found together at Elwood's home. The evidence of Curtis' guilt of the burglary at Giljohann's store is not strong, and in our opinion the beneficiary of the error in admitting Curtis' statements has not proved beyond a reasonable doubt that the error did not contribute to the verdict against him on the count charging the burglary at Giljohann's store. (*Chapman* v. *California, supra,* 386 U.S. 18 [17 L.Ed.2d 705, 86 S.Ct. 824].)

 Curtis' extrajudicial statements implicated Elwood in that Curtis stated that he left loot from the burglary at the

dress shop at Elwood's home, but since loot from that burglary was found in the search at Elwood's home Curtis' statements were not prejudicial as to Elwood.

The judgment as to Elwood is affirmed. The judgment as to Curtis is reversed. The orders denying a new trial are not appealable (Pen. Code, § 1237; *People* v. *King,* 60 Cal.2d 308, 309 [32 Cal.Rptr. 825, 384 P.2d 153]), and defendants' appeals therefrom are dismissed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

Appellants' petition for a rehearing was denied April 12, 1967, and the opinion and judgment were modified to read as printed above. Peters, J., did not agree with the opinion as modified and was of the opinion that a rehearing should be granted.